UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| *Timothy Hayes*<br>    *Plaintiff* | CIVIL ACTION NO.: 3: 00cv0973 |
| vs | |
| *COMPASS GROUP USA, INC., d/b/a*<br>*EUREST DINING SERVICE and*<br>*CARY ORLANDI*<br>    *Defendants* | |

## AFFIDAVIT OF TIMOTHY HAYES

I, TIMOTHY HAYES, hereby represent and state the following:

1. My name is Timothy Hayes and I am the plaintiff in the above captioned matter.

2. I reside at 147 Ledge Drive, Berlin, Connecticut 06037.

3. I am over the age of eighteen (18) years, and I understand and believe in the obligations of an oath.

4. My date of birth is September 30, 1950.

5. I am attesting to this Affidavit of my own free will.

6. I have personal knowledge of the facts attested to in this Affidavit, and I am prepared to testify to them at the time of hearing or trial.

7. I was employed with Compass Group since July 1973.

8. I was terminated by Compass Group in the early morning hours of June 1, 1998.

9. At the time I was terminated from Compass Group, I held the title as Regional Manager. In addition to being Regional Manager for the Northeast, I was also the District Manager for the Central Connecticut region.

*Mr. Brian Jendrezjczyk*

10. I knew Mr. Brian Jendrzejczyk ("Mr. Jendrezjczyk") for almost twenty-five (25) years.

11. Mr. Jendrezjczyk was a District Manager for Compass Group for the Connecticut area.

12. When I became Regional Manager in 1996, Mr. Jendrezjczyk began to report directly to me.

13. Mr. Jendrezjczyk did have problems performing his job as District Manager, however I still viewed him as an asset to Compass Group.

14. Mr. Jendrezjczyk was excellent when he was in charge of one (1) client. It was only when he was promoted to District Manager and was given responsibility for a number of clients that he had some difficulty. Knowing this, I had advocated giving him the position of General Manager at Electric Boat.

15. I had proposed to Mr. Keith Cullinan ("Mr. Cullinan"), Area Vice President at Compass Group, that we offer Mr. Jendrezjczyk the General Manager position at Electric Boat. Mr. Cullinan informed me that position was reserved for "employees who had an opportunity to develop their career."

16. Mr. Orlandi instructed me to develop a plan to terminate Mr. Jendrezjczyk. I took that to mean that he wanted me to begin a paper trail to terminate Mr. Jendrezjczyk.

17. When I voiced my opinion that Mr. Jendrezjczyk was still a valuable employee at Compass Group who could contribute in another position, Mr. Orlandi threatened my job security at Compass Group.

18. As a result of Mr. Orlandi's threat, I followed through and developed a paper trail and terminated Mr. Jendrezjczyk.

19. Based on my personal involvement in the above situation, knowledge of how other employees were handled and statements of Compass Group supervisors, I believe that had Mr. Jendrezjczyk been younger, Compass Group would have given him the opportunity to stay with the company, moving to the general manager position at Electric Boat, "developing his career", and avoid termination. Instead he was terminated from Compass Group.

*Mr. Joseph Wawryzinski*

20. Mr. Joseph Wawryzinski ("Mr. Wawryzinski") was the District Manager for the Buffalo, New York region.

21. Mr. Wawryzinski's employment was terminated in September 1998.

22. Mr. Orlandi referred to Mr. Wawryzinski as the "old style of coaching in Buffalo" and compared him to the former Buffalo Bills coach, Marv Levy.

23. Mr. Orlandi would often refer to the new Eurest style of doing business as a "change in culture." Mr. Orlandi made it known to me that it wasn't enough that your performance was good; you had to meet certain standards (i.e. well educated, physically fit, and good looking). I took this to mean that in order to succeed at Eurest and its "change in culture" one had to be "young, fast, and aggressive."

*Mr. George Yundt*

24. I have worked with Mr. George Yundt ("Mr. Yundt") at Compass Group for over twenty (20) years.

25. Mr. Yundt has shared his feelings to me that he too believes that he was discriminated against on the basis of his age.

*Opportunity for Advancement*

26. In the Spring of 1997 I was informed of a Sales Position opening in the Northeast within Compass Group.

27. I viewed this as an opportunity to advance my career with Compass Group. Consequently, I interviewed for the position.

28. Mr. Orlandi came to my Middletown, Connecticut Office and informed me that I was being considered for the sales position. At that time he begged me not to take the sales position and remain here as his Regional Manager. He specifically informed me that, "he could not run the Northeast Region without me."

29. As a result, I withdrew my name for consideration for the Sales Position.

30. Only a few months later the Sales Position became vacant again, and Mr. Orlandi again came to my Middletown office and asked me not to consider reapplying for this position, again complimenting my job performance and assuring me on a secure future in operations within the Northeast Region.

31. Based upon his glowing compliments to me and his assurance that I had a secure position with him in the Northeast Region for the rest of my career, I took a fifty thousand-dollar ($50,000.00) loan out against of my 401k, purchased a new home and refrained from reapplying for the Sales Position.

*Defamation*

32. In 1996, Ms. Joan Wedekind ("Ms. Wedekind") was my direct supervisor.

33. I reported to Ms. Wedekind even after Mr. Orlandi was made a Regional Vice President. In 1996, Ms. Wedekind was promoted to Regional Vice President of the Mid-Atlantic Region, and I was promoted to Regional Manager reporting to Mr. Orlandi.

34. While I worked for Ms. Wedeklind, we developed an excellent working relationship.

35. Upon being notified of my termination as Regional Manager, I immediately contacted Ms. Wedekind to assist me in either getting me reinstated in my former position or helping me find another position within Compass Group.

36. Ms. Wedekind told me that she would see what she could do about either getting my old job back and/or securing a position for me within Compass Group.

37. Approximately two (2) days later Ms. Wedekind informed me that, "Mr. Cary Orlandi had poisoned the well and that there was nothing she could do for me."

38. I took that to mean that Mr. Orlandi had published false information about me and my job performance throughout Compass Group to such an extent that I could no longer be viewed as an asset to the company and therefore would not be allowed to return to work at Compass Group in any capacity

39. On information and belief, Mr. Orlandi published false and damaging information about me throughout the business community and my former peers, including, but not limited to, Mr. Robert Kelley, Mr. Phillip Canning, Mr. Joseph Wawryzinski, and Mr. Edward Sanchez.

*Demotions*

40. Mr. Paul D'Amico a former Compass Group employee was demoted for performance reasons from his District Manager position.

41. At the time of demotion, Mr. D'Amico was in his mid-thirties (30's).

*Plaintiff's Employment Termination*

42. The reasons proffered by Compass Group for my termination are false, inaccurate, misleading, or incomplete. By way of specifics in regard to this statement I will now address the specific allegations of poor performance contained in paragraphs numbered five through fourteen of the defendant's Local Rule 56(a)1 statement dated October 30, 2003 and submitted with the defendant's Motion for Summary Judgement. The paragraphs will be specifically addressed, in order, by paragraph number, as follows:

5. The August 5, 1997 memo was perceived by me as a request from Mr. Orlandi for information on what he identified as "poor performing accounts". I did not perceive of this memorandum as indication my job was in jeopardy. I responded to the request for information noting that increased sales did not automatically equate to increased profits, providing explanations for each account noted. Mr. Orlandi accepted my report and explanation.

6. The August 13, 1997 memo referenced in regard to a survey "... the recent survey I received regarding Dow Jones." The defendant neglects to mention the survey from Dow Jones specifically states that Dow Jones was very happy with the performance of Mr. Hayes (myself). The survey does note, however, dissatisfaction with regional Vice President, Mr. Orlandi. Furthermore, I never received a copy of the memorandum of August 13, 1997 until after I was terminated.

7. The memorandum dated September 24, 1997 regarding alleged improper accounting practices was rescinded by Mr. Orlandi prior to delivery to the undersigned following further investigation by Mr. Orlandi. Mr. Orlandi realized that the undersigned acted under what the undersigned understood to be the directions of Mr. Orlandi. Furthermore, the undersigned corrected the transactions in question prior to the final posting into the period accounting system. The undersigned did not know of the existence of the memorandum of September 24, 1997 until after my termination. As to the letter of September 30, 1997, the undersigned responded to Mr. Orlandi with a memorandum of October 16, 1997 (copy attached) with supporting documentation and I maintain Mr. Orlandi's 9/30/97 memorandum does not accurately describe "deficiencies."

8. Electric Boat and JC Penny were poorly performing accounts. This came to the undersigned's attention when I was promoted to regional manager in 1996. I immediately informed Mr. Orlandi of the status of these accounts. Action plans addressing the longstanding performance problems in the accounts were strengthened in the fall of 1997. I followed through on all aspects of the plans, improved these accounts competently and the accounts were retained by Compass Group. My performance as regional manager in regard to these accounts was competent.

9. Although it is true six accounts were closed, this was due to changes in the business environment and not as a result of any poor or substandard performance by the undersigned. As to the performance evaluation of December 15, 1997 (Defendant council's affidavit - tab K) observations of less then competent are unfair and inaccurate. I did not go over Mr. Orlandi's head in regard to this evaluation because Mr. Orlandi, on a previous occasion, had threatened my employment if I did so. The evaluation was overall "approaching expectations- +".

10. The January 12, 1998 Memorandum from Mr. Orlandi to the undersigned does not constitute fair criticism of the undersigned's job performance. Items numbered one and three in that memorandum were the consequence of changes in accounting practices instituted after the close of the year and not my fault. Item number two related to vending machine (canteen activity) which again is not my fault. Item number four is inaccurate and unfair. The additional responsibility given to me at Electric Boat was client contact and negotiations. Day to day activity remained the responsibility of the district and account manager.

11. Middlesex Community College was not a financially rewarding account. The decision was made by Mr. Orlandi and Robert Kelly, Vice President of Canteen (vending division) in the spring of 1997 that this account should be cancelled by Compass before the opening of the fall semester unless a new fee arrangement could be negotiated with the client. Mr. Orlandi dictated to me a strongly worded letter to Robert Berg which was sent at Mr. Orlandi's direction. Mr. Berg took offense to the letter and refused to enter into a new fee agreement. The account was closed prior to the fall semester as planned by Mr. Orlandi. In the process of closing the account, several pieces of

Compass owned equipment were removed from the facility which again caused an angered response by Mr. Berg. I was never aware of Mr. Berg's comments directed at me until the date of my termination even though Mr. Orlandi received James Carothers' letter in mid March 1998. Mr. Berg never expressed any dissatisfaction with me to me prior to my termination.

12. I did not receive the April 13, 1998 memorandum in April. On or shortly after May 4, 1998 I received a similar document. My attorneys tell me it is identified as Tab 40 to Mr. Fangie's affidavit. I dispute the allegations of Mr. Orlandi as to my performance as set forth in that memorandum of May 4, 1998. Nonetheless, I attempted to address the issues raised in the 5/4/98 memorandum but the twenty-six days afforded me was insufficient time for me or any competent manager to address all these points.

13. Whether or not I had an extramarital affair was never made an issue by Mr. Orlandi or other supervisors in regard to my performance at Compass. I have never heard that it played any part in my termination. I never forced or pressured any district manager to promote my fiancee.

14. Based on all of the foregoing and other facts submitted to my attorneys for presentation to the court, I believe my termination was not based on "poor performance" and I dispute, as a matter of fact, the conclusions contained in paragraph fourteen of the rule 56(a1) statement.

43. I believe that my age, forty seven (47) was a factor in the defendants' decision to terminate my employment.

44. There are a significant number of older employees with a long tenure who also have been forced out by Compass Group and Mr. Cary Orlandi.

45. My performance was rated by my supervisors at Compass as commendable, above expectations or otherwise satisfactory until Mr. Orlandi's comments in the performance evaluation of December 1997.

46. My performance as Regional/ District manager for Compass during 1997 through May 1998 was, despite Mr. Orlandi's comments, competent.

*Emotional Distress*

47. The trauma and emotional distress that I had to endure was devastating to my self esteem and my confidence and it literally effected every aspect of my life. Moreover, because of the defendants, my confidence as an employee in the food service business was ruined.

48. The fear of having to literally start my career all over at the age of forty seven (47) with no job prospects was horrifying to myself and my family.

49. I was so ashamed and embarrassed that I was afraid to leave my house out of fear that

I may accidentally run into a former client or former colleague of Compass Group.

50. As of the date of this affidavit I am still afraid of going to places or events where there is a large crowd for fear that I may accidentally run into a former client or former colleague of Compass Group.

51. At the time of termination, my family had just recently purchased a new home. With no income, I was certain that we would not be able to make the payments and consequently we would lose our home.

52. I was reluctant to get my mail, for fear that there would be bills that I knew I could not pay.

53. The financial uncertainty and the embarrassment that the defendants caused me was immense. I was constantly nauseous, with stomach cramps, vomiting, and extreme nervousness.

54. My family life was also negatively effected by the defendants' actions.

55. I was embarrassed and distressed about the fact that I could not provide for my family.

56. After the deceptive behavior and blatant lies by Mr. Orlandi/ Compass Group I am still to the point that I cannot trust anybody. I am very guarded about what people say to me and what people promise me.

### Affirmation

On this 5th day of January, 2004 I, TIMOTHY HAYES, submit this Affidavit and hereby affirm that the Statement I have given in regard to the above-captioned matter is signed under the pains and penalties of perjury.

TIMOTHY HAYES

The foregoing was sworn and subscribed before me this 5th day of January, 2004 in the City of Hartford, County of Hartford, State of Connecticut by Timothy Hayes.

Donna H. Pare, Notary Public
My commission expires: 12/31/08

**MEMORANDUM**

**To:** Cary Orlandi
**From:** Tim Hayes
**Subject:** Certified letter dated 9-30-97
Postmarked 10-10-97 / Received 10-14-97
**Date:** October 16, 1997

I am writing you to let you know how shocked and disappointed I am upon receipt of your 9/30/97 correspondence; particularly where you reference the Middletown Districts' 1997 financial performance. The attached 1997 area review is self explanatory. The period profitability reports show that the Middletown Districts have been <u>very close to target</u> throughout the year, finishing 1997 13k better than plan.

Electric Boat has been very difficult throughout the year and I am truly distressed by the financial losses. Attached correspondence is self-explanatory. Through all my efforts, I could not force Electric Boat to meet our schedule for completing the facility work necessary for Eurest to realize the financial turnaround desired. Today Electric Boat signed the new contract with all the language we desired. Yes, it cost $60,000 more in 1997 than we anticipated due to Electric Boat's delays, but Compass has retained one of the most profitable accounts in our region's history; secure for 10 years into the future with concessions from Electric Boat which will greatly improve our future profitability. Electric Boat plans to have the renovations ready in December.

Lastly, weekly flashes. I agree 100% with you that our managers need to improve the accuracy of the numbers they call into Waltham. I will again review the forecast & operating report procedures at the Managers Meeting I have scheduled for 10/21/97. Our goal to have less than $100 variance is lofty. I will continue to work with our managers. Please have George work with the Waltham staff to eliminate errors on their end, i.e. the two General DataComms and Grolier were instructed to longer call in their number by Waltham office personnel. In our criticism of the job our managers are doing with their weekly accounting, please remember that rebates, discounts, commissions, and payroll related costs are all estimates which often skew our managers' reports to the final numbers.

As always, I will do everything in my power to continue the success of Compass Group USA in the Northeast Region.

Please maintain this entire package on record.

Thank You.

cc: J. Figueroa

**Eurest**
*Dining Services*

attachments: Electric Boat Correspondence (4 pages)
1997 Area Review (6 pages)