UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| TIMOTHY HAYES, ) | |
| ) | |
| Plaintiff, ) | |
| ) | C.A. NO.: 3:00 CV 0973 (AHN) (HBF) |
| v. ) | |
| ) | |
| COMPASS GROUP USA, INC., ) | |
| d/b/a EUREST DINING SERVICES ) | |
| and CARY ORLANDI, ) | |
| ) | |
| Defendants. ) | |

## AFFIDAVIT OF CHRISTOPHER A. KENNEY
## IN SUPPORT OF DEFENDANTS' REPLY TO
## PLAINTIFF'S OPPOSITION TO SUMMARY JUDGMENT

I, Christopher A. Kenney, depose and state:

1.     I am an attorney duly admitted to practice before the United States District
Court for the District of Massachusetts and I have been admitted pro hac vice in this
matter. I represent defendant Compass Group USA, Inc. in this case.

2.     Attached as Tab A is a true and accurate copy of excerpts from the
deposition of Joseph Wawrzynski, taken on April 30, 2003 in Canning v. Compass Group
USA et al, No. MICV2000-03579 (Mass.Super. Middlesex June 9, 2003).

3.     Attached as Tab B are certified copies of the judgments entered in the
matter of Canning v. Compass Group USA et al, No. MICV2000-03579 (Mass.Super.
Middlesex June 9, 2003).

4.     Attached as Tab C is a true and accurate copy of <u>Evans v. Marks</u>, 36

Conn. L. Rptr. No. 2, 42 (Conn.Super. Jan. 12, 2004)(Levin, J.).


Signed under the pains and penalties of perjury this 16th day of January, 2004.

Christopher A. Kenney

**TAB A**

VIDEO TELECONFERENCE
JOSEPH R. WAWRZYNSKI

# ORIGINAL

COMMONWEALTH OF MASSACHUSETTS

MIDDLESEX, SS.          SUPERIOR COURT DEPARTMENT
OF THE TRIAL COURT
CIVIL ACTION NO. MICV2000-03579

------------------------------------------
PHILIP G. CANNING,

                    Plaintiff,

          - vs -

COMPASS GROUP USA, INC.,
DIVISION/EUREST and
CARY ORLANDI,

                    Defendants.
------------------------------------------


          Video teleconference and deposition of

JOSEPH R. WAWRZYNSKI, taken pursuant to Notice, in

the offices of JACK W. HUNT & ASSOCIATES, INC.,

1420 Liberty Building, Buffalo, New York, on April

30, 2003, commencing at 1:15 p.m., before RICHARD B.

WHALEN, CSR, RDR, CRR, Notary Public.

          JACK W. HUNT & ASSOCIATES, INC.

1          Q.    Do you recall telling me that you

2     believed that Cary was motivated to terminate you

3     because you were one of the higher paid managers

4     among your peers in the region?

5          A.    That probably was -- yeah, I did say

6     that to you.

7          Q.    You do recall saying that?

8          A.    I do recall saying that, yes.

9          Q.    Okay.  Now, since you answered the

10    question, I just need to be able to ask the next

11    question, which was, do you believe that that's --

12    that it -- strike that.

13         Is what you told me on the telephone still

14    your belief about the reasons that motivated

15    Mr. Orlandi to terminate your position?

16         A.    I guess I don't understand your

17    question.

18         Q.    All right.  Well, when we spoke on the

19    telephone a few weeks ago, I believe you said that

20    you believed that Mr. Orlandi was motivated to

21    terminate you because you were one of the higher

22    paid managers in the region and his interest was in

23    improving the financial performance of his region

23

1   and save --

2        MS. PONTIKES:  Objection.

3        BY MS. PAGET:

4        Q.   Is that correct?

5        A.   I -- I didn't hear what she said.

6        Q.   Did you hear my question?

7        A.   Yes, I did.

8        Q.   Okay.  Could you answer it?

9        MS. PONTIKES:  Objection to the question.

10       BY MS. PAGET:

11       Q.   You can answer.

12       MS. PONTIKES:  I'm going to be objecting to

13  her questions.  I'm objecting to the form of it and

14  we're reserving that for the record, but generally

15  you should answer the question after I object.

16       THE WITNESS:  I think that was probably one

17  of the reasons.

18       BY MS. PAGET:

19       Q.   Okay.  And why do you think that was

20  probably one of the reasons?

21       A.   Well, you know, Cary was a very

22  deliberate person and in -- in the corporation,

23  making the budget was something that was, you know,

24

1    a key to your success in the corporation.

2         And so I think that that did have some

3    bearing on why he let me go.  I feel that it wasn't

4    the only factor.  I feel that --

5         Q.   All right.  Well, I'll get to that.

6         A.   Okay.

7         Q.   I just need you to answer, try to answer

8    the question I've asked and I will ask follow-up

9    questions where it seems necessary.

10        MS. PONTIKES:  Objection.  I'd like the

11   witness to be able to finish answering the question.

12        BY MS. PAGET:

13        Q.   Mr. Wawrzynski, were you not finished

14   with your response to my last question?

15        A.   No, I was not.

16        Q.   Okay.  What else did you have to say?

17        A.   Well, I think that Cary objected to some

18   of the senior people who were not, oh, intimidated

19   by his position as regional vice president and maybe

20   thought that he did not get the respect that his

21   office deserved because of the fact that he was a

22   regional vice president.

23        In other words, it was a situation where at

1    the meetings, the senior district managers generally

2    were more outspoken regarding his menu or venue that

3    he was trying to promote and would question him.

4         And I think that irritated him to a certain

5    extent.  And I was known as a very outspoken person

6    and consequently, I think I was on his hit parade as

7    far as problems that, you know, could go away if I

8    was no longer working for Compass.

9         Q.   Okay.  So you've identified two reasons

10   that you think led to Mr. Orlandi's decision to

11   eliminate you or your position from Compass:

12        One, a desire to save money and make the

13   budget; two, a desire to get rid of you because you

14   were outspoken in criticizing him or some of his

15   initiatives.

16        Is that correct?

17        A.   Yes.  And in addition --

18        Q.   All right.  I'll ask you questions, but

19   the deposition will go much quicker if you can limit

20   your responses to the question I've asked.

21        MS. PONTIKES:  Objection.  Again I'd like the

22   witness to be able to finish answering.

23        MS. PAGET:  Well, then we're going -- you're

1    going to be listening a lot of motions to strike on

2    nonresponsive testimony.

3         MS. PONTIKES:  I'm objecting because the

4    witness is trying to answer the question and he's

5    being interrupted.

6         MS. PAGET:  Your -- okay.  I think I'll warn

7    you now, speaking objections are inappropriate.  You

8    have a right to object, right, not to engage in a

9    colloquy on the record.

10        MS. PONTIKES:  So the record is clear, I am

11   not engaging in a colloquy.  I am asking that the

12   witness be allowed to be able to finish his

13   objections -- excuse me, finish his answer because

14   he's being interrupted.

15        MS. PAGET:  That's ridiculous.

16        MS. PONTIKES:  You can characterize it any

17   way you would like but I would like the witness to

18   be able to finish answering his questions before he

19   is asked another question.

20        BY MS. PAGET:

21        Q.   Mister --

22        A.   May we go off the record for a minute?

23        Q.   No.

27

1          A.   Oh, okay.

2          Q.   Unless you need to use the rest room or

3    need a glass of water.

4          A.   Okay.  I need to use the rest room.

5          Q.   Okay.

6          A.   I'll be right back.

7          (A recess was then taken.)

8          BY MS. PAGET:

9          Q.   Mr. Wawrzynski, apart from what you've

10   testified to earlier, do you believe that there are

11   any other or were any other reasons for the decision

12   to terminate your employment with Compass?

13         A.   It's probably in the same line as not

14   being intimidated by Cary, but there were some

15   instances when Cary asked me to do some things that

16   I refused to do.

17         And I basically indicated to him that if he

18   wanted those things done, he would have to do them

19   himself.

20         Q.   Have you finished your response?

21         A.   Yes.

22         Q.   All right.  My question was, apart from

23   what you've testified to earlier, do you believe

28

1    there are any other reasons for the decision to

2    terminate your employment with Compass?

3        A.    No, I think that's probably the reasons.

4    Those are the reasons.

5        Q.    Okay.  Can you describe what your duties

6    entailed as a regional manager under Mr. Orlandi's

7    authority?

8        A.    As a senior district manager, which was

9    the title that I had, I had reporting to me two

10   other district managers:  One in Buffalo, Mark

11   Hannon; and one in Syracuse, Dan Nagle.

12        Each district manager had a number of food

13   service units that reported directly to them.  I

14   additionally had some units in the Western New York

15   area that reported directly to me.

16        And as such, on the weekly reporting of

17   financial results that went to the district office

18   every Monday, I was responsible for putting together

19   the financial reports that showed where we were as

20   far as sales and profit contribution.

21        I over -- I oversaw what Dan and Mark did,

22   would be involved in meeting with customers to

23   discuss contractual issues that may come up from

62

1    take the financial situation and improve upon it and

2    increase the operational effectiveness of the

3    particular units.

4        Q.   Okay.  Did Mr. Orlandi ever tell you

5    that he felt that you were too old to be working at

6    Compass or used words to that effect?

7        A.   There was a conversation when he asked

8    me how long I was going to continue working and I

9    think I gave him an answer.

10       It was a dinner one time when he was doing a

11   review of me.  And, you know, at that time, I think

12   I told him that I would like to probably work for a

13   couple years and then get out of here.

14       Q.   Do you recall anything else that he said

15   to you during that conversation?

16       A.   Well, he did my -- he did my evaluation

17   and, you know, I -- you know, I -- he gave me a list

18   of things that he thought that I should improve upon

19   and pointed out his perceived weaknesses of my

20   particular job performance.  And one of the items

21   was my inability to resolve the situation at Delphi.

22       Q.   Okay.  Did any of his criticisms of you

23   ever orally or in writing relate to your age?

63

1          A.    Just -- just the comments when he asked

2    me how -- how long I expected to continue to be

3    working for the company.

4          Q.    Did you feel that that was a derogatory

5    or improper question?

6          A.    No, I don't.

7          Q.    Okay.   Have you ever heard or observed

8    Mr. Orlandi remark about Mr. Canning's job

9    performance?

10         A.    I'm sorry, would you repeat that?

11         Q.    You're familiar with Philip Canning,

12   correct?

13         A.    Yes.   Yes.

14         Q.    Who is he?

15         A.    He was a senior district manager working

16   for Cary out of Boston.

17         Q.    Would you describe him as one of your

18   peers at Compass?

19         A.    Yes.

20         Q.    And were you friendly with Mr. Canning?

21         A.    Well, I don't know what friendly means,

22   okay.   He was my peer.   We didn't go out drinking

23   together or anything like that.   We were in a

98

1    decision and suggested it to human resources?

2        A.   I don't actually know, but in most

3    instances, the direct report makes the

4    recommendation and the recommendation is either

5    approved or disapproved.

6        Q.   Who would the direct report have been in

7    your instance?

8        A.   Cary.

9        Q.   Do you think that age discrimination

10   played any factor in your termination from Compass?

11       A.   I -- I do not know.  I know that I did

12   irritate the man.

13       Q.   The man is Mr. Orlandi?

14       A.   The man is Mr. Orlandi.  As I said

15   before, I was sort of outspoken, which he did not

16   appreciate.  But, you know, in the exit interview,

17   age, of course, never came up.

18       Q.   Never came, up you said?

19       A.   In the exit -- when he did the actual

20   discharge, age did not come up.

21       Q.   Did you ever witness anyone who was

22   younger irritating Mr. Orlandi in the same way that

23   you did?

99

1          A.    They wouldn't dare.  No.

2          Q.    Are you familiar with an individual

3     named Drew Holland?

4          A.    No, I am not.

5          Q.    You gave some testimony regarding

6     meetings that -- that the senior district managers

7     had with Mr. Orlandi.

8          Do you recall that testimony?

9          A.    Yes.

10          Q.    How often did these meetings occur?

11          A.    Generally he tried to have one on a

12     monthly basis but in some cases, it might go for two

13     months.  It would depend on the time of the year and

14     the crush of business at the time.

15          Q.    Where were these meetings?

16          A.    In most instances, they were somewhere

17     in the Boston area.

18          Q.    And who else was in attendance besides

19     yourself and Mr. Orlandi?

20          A.    All of the district managers that were

21     in the Boston area.  All of the senior district

22     managers, the controller, his secretary, some of the

23     staff that was in food standards and things of that

100

1    nature.  There were probably 20 or 35 people.

2         Q.    You gave some testimony about

3    Mr. Orlandi praising Mr. Canning at the regional --

4    at these meetings.

5         Do you recall that testimony?

6         A.    Yes, I do.

7         Q.    Do you recall the time -- the time

8    period when Mr. Orlandi made these comments about

9    Mr. Canning's performance?

10        A.    Well, the first and most stunning

11   probably was when we were at a meeting, Cary just

12   announced that Phil Canning was going to be the

13   senior district manager in charge of the Boston

14   area.

15        And, you know, it was a situation where it

16   was just said and everybody in the room's jaw just

17   dropped regarding the way the announcement was made.

18        And at that time, he was very complimentary

19   regarding, you know, what Phil had done and what he

20   was going to be doing.  Also --

21        Q.    Do you remember -- I'm sorry.  Finish

22   your answer.

23        A.    Also at -- at subsequent meetings, Phil

118

1          I hereby CERTIFY under the pains and

2    penalties of perjury that I have read the foregoing

3    117 pages, and that they are a true and accurate

4    transcript of the testimony given by me in the

5    above-entitled action on April 30, 2003.

6

7                                    .

8                     ------------------------

9                     JOSEPH R. WAWRZYNSKI

10

11

12

13

14

15

16

17

18

19

20

21

22

23

119

```
 1    STATE OF NEW YORK)
 2                     ss:          ORIGINAL
 3    COUNTY OF ERIE  )
 4         I DO HEREBY CERTIFY as a Notary Public in and
 5    for the State of New York, that I did attend and
 6    report the foregoing deposition, which was taken
 7    down by me in a verbatim manner by means of machine
 8    shorthand.  Further, that the deposition was then
 9    reduced to writing in my presence and under my
10    direction.  That the deposition was taken to be used
11    in the foregoing entitled action.  That the said
12    deponent, before examination, was duly sworn by me
13    to testify to the truth, the whole truth and nothing
14    but the truth, relative to said action.
15
16
17                    _____
18                    RICHARD B. WHALEN,
                      CSR, RDR, CRR,
19                    Notary Public.
20
21
22
23
```

**TAB B**

# Commonwealth of Massachusetts
## County of Middlesex
## The Superior Court

CIVIL DOCKET# **MICV2000-03579**

Canning
vs.
Compass Group USA Division/Eurest et al

### JUDGMENT ON JURY VERDICT AS TO COUNTS I AND II

This action came on for trial before the Court and a jury, Judith Fabricant, Justice, presiding, the issues having been duly tried and the jury having rendered its verdict,

It is **ORDERED and ADJUDGED:**

That the plaintiff, Philip G. Canning take nothing, that counts I and II be dismissed on the merits, and that the defendants, Compass Group USA Division/Eurest and Cary Orlandi recover of the plaintiff its costs of action.

Dated at Cambridge, Massachusetts this 9th day of June, 2003.

Edward J. Sullivan,
Clerk of the Courts

By: *Lisa M. Kusmirek*

Assistant Clerk

---

MIDDLESEX. ss.   **Commonwealth of Massachusetts**

SUPERIOR COURT DEPARTMENT OF THE TRIAL COURT

In testimony that the foregoing is a true copy on file and of record made by photographic process, I hereunto set my hand and affix the seal of said Superior Court this fourteenth day of January 2004.

Deputy   Assistant Clerk

---

cvdjudverd_1.wpd 1905312 trkset kusmirek

*Copies mailed 6/10/03*

**Commonwealth of Massachusetts**
**County of Middlesex**
**The Superior Court**

MICV2000-03579

Canning
vs.
Compass Group USA Division/Eurest et al

### JUDGMENT ON DIRECTED VERDICT AS TO COUNT IV

This action came on for trial before the Court and a jury Judith Fabricant, Justice presiding, and the issues having been duly tried and a Motion for a Directed Verdict for the defendant having been allowed by the Court after hearing,

It is **ORDERED AND ADJUDGED:**

That the Plaintiff Philip G. Canning take nothing, that Count IV be dismissed on the Merits, and that the Defendant, Compass Group USA Division/Eurest, recover of the  plaintiff, Philip G. Canning its costs of action.

Dated at Cambridge, this 9th day of June, 2003.

Edward J. Sullivan,
Clerk of the Courts

By: _Lena M. Kuminick_

Assistant Clerk

---

MIDDLESEX, ss.   **Commonwealth of Massachusetts**

SUPERIOR COURT DEPARTMENT OF THE TRIAL COURT

In testimony that the foregoing is a true copy on file and of record made by photographic process, I hereunto set my hand and affix the seal of said Superior Court this fourteenth day of January 2004.

_____
Deputy          Assistant Clerk

Copies mailed 6/10/03

COMMONWEALTH OF MASSACHUSETTS

MIDDLESEX, SS.

SUPERIOR COURT DEPARTMENT
OF THE TRIAL COURT
CIVIL ACTION NO. MICV 2000-03579

PHILIP G. CANNING,               )
                                 )
        Plaintiff,               )
                                 )
v.                               )
                                 )
COMPASS GROUP USA, INC.,         )
DIVISION/EUREST and CARY         )
ORLANDI,                         )
                                 )
        Defendants.              )

## DEFENDANT'S MOTION FOR DIRECTED VERDICT

### Introduction

Defendants move for entry of directed verdict against plaintiff Philip Canning on each count of his Amended Complaint. Counts I and II, for alleged age discrimination and aiding and abetting, should be dismissed because Canning has failed to offer evidence that age bias against him was a determining factor in the decision to eliminate his position. Count IV, which alleges breach of contract for failure to pay severance benefits in an amount equal to 34 weeks' pay, should not be submitted to the jury because Canning has failed to present evidence which, if believed, would establish either an express or implied contractual obligation to pay him severance in that amount.[1]

Canning admitted the following facts during his testimony:

---

[1] Canning voluntarily dismissed his claim for intentional interference with advantageous business relations, brought under Count III, at the start of trial.

1

1.   Canning's employment with Compass was at-will and was not governed
     by any written employment agreement;

2.   Michael Bailey, Compass' president whom Canning alleges made certain
     promises to him and others about his entitlement to "benefits", never discussed
     the subject of severance pay, much less promised to Canning or others the
     payment of severance in any particular amount or in accordance with any
     particular policy;

3.   Canning never received, saw or relied upon any policy governing the payment of
     severance benefits at any time during his employment with Compass, was never
     told that any severance policy would govern his employment and was unaware of
     the contents of any such policy or policies; and

4.   The only written policy that Canning received during his employment was the
     Associates Handbook, which contains no policy providing for the payment of
     severance to employees.

Canning has offered no evidence of an express contract, nor evidence that could establish

the consideration necessary for an implied contract, because he admits he did not receive, much

less rely upon, any promise to pay severance. As a matter of law, the absence of any such

reliance is fatal to his claim and compels entry of a directed verdict on this claim.

### Standard for Granting Directed Verdict

In determining whether to direct a verdict dismissing a claim, the court must decide

"whether the evidence, construed most favorably to the plaintiff, could not support a verdict for

the plaintiff." Goffredo v. Mercedes-Benz Truck Co., 402 Mass. 97, 101 (1988), quoting Poirier

v. Plymouth, 374 Mass. 206, 212 (1978). The Court should enter a directed verdict against a

breach of contract claim where the agreement cannot be construed to impose the obligations

alleged by the plaintiff. See also e.g., Gagnon Welding & Contracting Corp. v. Town of

Lynnfield, 56 Mass. App. Ct. 1112 (2002) (unpublished) (holding that it was error to deny

motion for directed verdict on contract claim where fully integrated, unambiguous contract did

not impose upon defendant certain obligations that the plaintiff claimed were breached). This

standard applies to contract claims arising in the employment context. See e.g., Vitagliano v.

Interface Group-Massachusetts, Inc., 49 Mass. App. Ct. 1119, 1119 (2000) (holding no error in directing verdict against claim for breach of employment agreement where evidence was undisputed that plaintiff's employment was at-will and that parties agreed that all terms and conditions of employment would be in writing). The evidence at trial, most of which has come from Canning himself, cannot support a verdict that any contract, express or implied, existed between Canning and Compass for the payment of severance benefits in the amount of 34 weeks' pay.

## ARGUMENT

### A.    Canning Has Failed To Offer Evidence That Could Support A Finding That He Relied To His Detriment On Any Promise To Pay Severance Benefits To Him In An Amount Equal to 34 Weeks' Salary.

Canning admits that his employment was at-will, and that no written employment agreement governed the terms and conditions of his employment with Compass. In light of this evidence, his contract claim could succeed only if he were to establish that he relied to his detriment on some promise to pay him severance in the amount he now claims is due. "In order for a contract to have valid consideration, the contract must be a bargained-for exchange in which there is a legal detriment of the promisee or a corresponding benefit to the promisor." Hinchey v. Nynex Corp., 144 F. 3d 134, 142 (1st Cir. 1998) (holding that promises made by employer to employee, after termination, were unsupported by consideration). Canning cannot show that during his employment he relied to his detriment on any promise – oral or written – to pay him severance in the amount of 34 weeks, and therefore cannot prove the existence of legal detriment that is required to support his claim. "Legal detriment means giving up something which immediately prior thereto the promisee was privileged to retain, or doing or refraining from doing something which he was then privileged not to do, or not to refrain from doing." Id.,

3

at 143 (internal quotations omitted). This rule applies to contract claims that are premised on alleged promises in an employer's policy manual. See e.g. O'Brien v. New England Tel. & Tel. Co., 422 Mass. 686, 691 (1996).

> ### 1. Michael Bailey's Alleged Statements Fail To Establish A Promise To Pay Severance Benefits In Any Amount

According to Canning's own testimony, the statements of Compass' president Michael Bailey, promising that Service America employees' years of employment would be credited to calculations of "benefits", never included any statements concerning *severance*, much less payment of severance in any specific amount or according to any specific policy. As a matter of law, Canning's testimony about Bailey's general reference to "benefits" and Bailey's statements that Service America employees would receive "benefits" in accordance with their years' service is too vague to constitute a promise to pay severance much less severance in the amount claimed by Canning. See Buker v. National Management Corp., 16 Mass. App. Ct. 36, 42 (1983) (affirming summary judgment against plaintiff where defendant's oral promise to "work things out" was too vague to constitute basis for modified contract and was unsupported by consideration); Held v. Zamparelli, 13 Mass. App. Ct. 957, 962 (1982) (affirming dismissal of alleged oral promise to pay one-fourth of profits from operations on property if plaintiff withheld from exercising her right to repurchase property, because such an alleged promise was silent on essential terms). As in Zamparelli, Michael Bailey's alleged statements falls far short of establishing the existence of a promise to pay severance, much less severance in a specific amount.

"Nor was there any showing, as there must have been under our case law, 'that [Canning's] continued employment (was) in reliance on the promised benefit.'" Wood v. Roy Lapidus, Inc., 10 Mass. App. Ct. 761, (1980); quoting Balkin v. Frank M. Katz, Inc., 373 Mass.

4

419, 422 (1977). This case is a car cry from the facts in <u>Balkin</u>, where the Court held that where an employer specifically promised an employee the payment of <u>pension</u> benefits in the definite amount of $100 per week, followed by the employee's continued work for another six years, the employee was entitled to have a jury consider his claim for failure to pay the pension benefits in the amount promised. <u>Id.</u> Try as he might, Canning has offered no such evidence that might establish such a definite promise on the part of Michael Bailey, much less that his continued employment was in reliance on Bailey's statements.

> 2.    *The Severance Policy Does Not Establish A Contract To Pay Severance Because Canning Testified That He Did Not Rely On It*

Canning cannot succeed in transforming the Severance Policy in Compass' Human Resources Policy and Procedures Manual into an implied contract for payment of severance benefits, because he admits that he never saw, received or relied on it during his employment. Rather, Canning admits that the first time he saw the Severance Policy was after his employment with Compass ended. As a matter of law, this concession is fatal to any claim that the Severance Policy constitutes an enforceable contract with Compass for the payment of severance:

> Surely, *if the parties agree in advance of employment* that a personnel manual will set fort relative rights and obligations of employer and employee, the manual becomes part of the employment contract. A similar result would be obtained *if, during the course of at-will employment*, the parties agree, orally or in writing, that *thereafter* their rights and obligations would include the provisions of an employee manual. An employee remaining with the employer *after* receiving a manual provides the consideration necessary to support the contract.

<u>O'Brien v. New England Tel. & Tel. Co.</u>, 422 Mass. 686, 691 (1996) (emphasis supplied). In determining whether a personnel manual gives rise to contractual duties, "the central inquiry is whether, under the circumstances, the employee reasonably believed that the terms of the document constituted the terms or conditions of employment, equally binding on employee and employer." <u>Hinchey v. NYNEX Corp.</u>, 979 F. Supp. 40, 42-43 (D. Mass. 1997), *aff'd* 144 F. 3d

5

134 (1st Cir. 1998) (granting summary judgment to employer where employee could not show

that he reasonably expected reduction-in-force plan to bind both he and his employer) (internal

quotations omitted).

Where an employee cannot demonstrate any knowledge of – or even familiarity with – a

personnel manual or its policies, then as a matter of law he cannot prove any reliance, much less

detrimental reliance, on that policy or manual, or any reasonable expectancy that his employer is

bound by its provisions.  See O'Brien, supra; and Pollini v. Raytheon Co., 1999 WL 681675, *3

(D. Mass. 1999) (Lasker, J.).  In Pollini, the Court rejected a plaintiff-employee's claim that he

believed his employer's personnel manual constituted an implied contract, where "[the

employee] admitted that he did not remember even receiving a personnel manual, adding that he

understood that [the employer] maintained a book of policies and procedures at its Lexington

office.  There is no evidence that [the employee] knew of [the employer's] policies or relied on

them." Pollini, at *3.  The facts of this case are nearly identical to those of Pollini.  As in both

O'Brien and Pollini, supra, Canning freely admits that he was unaware of the Severance Policy

during his employment, that Compass never distributed the Policy to him or discussed it with

him or told him that it would apply to his employment, nor did he receive it during his

employment.  This evidence cannot support a finding that Canning relied on the Severance

Policy during his employment, and therefore should defeat his claim for breach of contract.

### B.    Canning Has Failed To Proffer Evidence That Could Sustain A Finding That Age Was A Determining Factor In The Decision To Eliminate His Position

Canning has offered no evidence that Cary Orlandi terminated Canning's employment

because of Mr. Canning's age.  First, Canning admitted on cross-examination that none of the

purportedly age-related comments that Mr. Orlandi made about other employees were directed to

or about him.  Nor has any other witness testified that such remarks were made about Canning.

6

Second, none of the testimony from any witness reasonably allows the inference that the reasons given for Canning's termination – financial and budgetary in nature – were false or illegitimate or lacking in credibility. Third, Canning has not offered evidence showing that the decision to select him for lay-off, rather than John Edick or Ed Baia, was illegitimate or made in bad faith or that it was a sham to cover some ulterior motive. The absence of such direct or circumstantial evidence precludes any inference that age was a motivating factor in the decision to eliminate Mr. Canning's position. As such, Canning cannot prove this essential element of his claims. <u>See Lipchitz v. Raytheon Company</u>, 434 Mass. 493, 502 (2001). Counts I and II, therefore, should be dismissed.

**WHEREFORE**, Compass Group USA, Inc. requests that the Court Direct a verdict against the Amended Complaint and dismiss Canning's claims in their entirety.

COMPASS GROUP, USA, INC. and
CARY ORLANDI,

By their attorneys,

Christopher A. Kenney, BBO #556511
Margaret H. Paget, BBO # 567679
Sherin and Lodgen LLP
100 Summer Street
Boston, Massachusetts 02110
(617) 646-2000

Dated: June 3, 2003



MIDDLESEX, ss.    **Commonwealth of Massachusetts**
SUPERIOR COURT DEPARTMENT OF THE TRIAL COURT

In testimony that the foregoing is a true copy on file and of record made by photographic process, I hereunto set my hand and affix the seal of said Superior Court this fourteenth day of January 2004.

Deputy                    Assistant Clerk

**TAB C**

Because the appellate courts had not ruled on the issue, the superior courts were attempting to determine legislative intent where the statutory language was ambiguous. Now, however, the Legislature has repealed §52-182, §52-183, and §14-295. Section 2 of P.A. No. 03-250 provides as follows:

Section 14-295 of the General Statutes is repealed and the following is substituted in lieu thereof (Effective October 1, 2003, and applicable to causes of action accruing on or said after said date):

In any civil action to recover damages resulting from personal injury, wrongful death or damage to property, the trier of fact may award double or triple damages if the injured party has specifically pleaded that another party has deliberately or with reckless disregard operated a motor vehicle in violation of section 14-218, 14-219, 14-222, 14-227a, 14-230, 14-234, 14-237, 14-239 or 14-240a, and that such violation was a substantial factor in causing such injury, death or damage to property. *The owner of a rental or lease to motor vehicle shall not be responsible for such damages unless the damages arose from such owner's operation of the motor vehicle.*

It appears that the Legislature has clarified its original intent by the addition of the last sentence. For this reason, the court finds that neither General Statute §52-182 nor §52-183 permits imposing liability for double or treble damages on the non-operator owner of a motor vehicle.

The defendants' motion to strike counts three and four of the complaint as to Defendant Qadar is granted.

---

### Suprena Evans v. David Marks et al.
Superior Court at Bridgeport
No. 361604
Memorandum Filed November 12, 2003

**Judgments – Collateral Estoppel – Misc. Cases – Determinations in Unemployment Compensation Proceedings Have No Preclusive Effect in Other Proceedings.**

**Unemployment Compensation – Procedural Matters – Misc. Cases – Determinations in Unemployment Compensation Proceedings Have No Preclusive Effect in Other Proceedings.** By statute, any factual or legal conclusion rendered in a proceeding for unemployment compensation benefits may not be given preclusive effect in other types of proceedings, CGS §31-249g(b). Therefore a denial of unemployment compensation benefits by the Employment Security Division on the grounds that the applicant was discharged for wilful misconduct does not collaterally estop the applicant from subsequently suing for wrongful discharge in retaliation for having filed a worker's compensation claim in violation of CGS §31-290a.

**Master and Servant – Employment Termination Claims – Misc. Cases – Written Statement of the Reason for an Employee's Discharge Contained in a Termination Notice Is Absolutely Privileged.**

**Torts – Defamation – Privileges – Written Statement of the Reason for an Employee's Discharge Contained in a Termination Notice Is Absolutely Privileged.** A written statement of the reason for an employee's discharge included in an unemployment notice (or "pink slip"), is absolutely privileged and therefore cannot be the basis for claims of defamation or intentional and negligent infliction of emotional distress.

**Master and Servant – Employment Termination Claims – Misc. Cases – Termination Letter Falsely Stating that an Employee Was Being Terminated for Dishonesty Is Not Sufficiently "Extreme or Outrageous" to Support a Claim of Intentional Infliction of Emotional Distress.**

**Torts – Infliction of Emotional Distress – Extreme and Outrageous Conduct – Termination Letter Falsely Stating that an Employee Was Being Terminated for Dishonesty Is Not Sufficiently "Extreme or Outrageous" to Support a Claim of Intentional Infliction of Emotional Distress.** A written statement contained in a termination letter published only to the employee advising the employee that the termination is for the commission of dishonest acts is not sufficiently extreme or outrageous to support a claim of intentional infliction of emotional distress, even if the stated reason is known to be false.

---

LEVIN, J. Before the court is the defendants' motion for summary judgment in this employment-related action. On March 25, 1999, the plaintiff, Suprena Evans, filed an eight-count complaint against the defendants, David Marks and Aldamar Toys, Inc. d/b/a Learning Express (Aldamar).

The plaintiff alleges the following in her complaint. In October 1998, the plaintiff was an employee at Aldamar, where Marks served as the president. On or about October 2, 1998, she suffered a work-related back injury. On October 13, 1998, Marks terminated the plaintiff from her employment for alleged wilful misconduct. It is undisputed that on January 19, 1999, the parties engaged in a contested hearing before a referee of the Employment Security Division of the State of Connecticut Department of Labor concerning whether Evans was entitled to unemployment benefits following her discharge from Aldamar. On February 9, 1999, the unemployment compensation appeals referee rendered a decision in favor of the plaintiff, granting her unemployment compensation benefits. The referee found that the plaintiff was discharged from employment "for reasons other than wilful misconduct in the course of her employment." On February 24, 1999, Aldamar appealed the referee's decision to the appeals division of the Connecticut

department of labor security appeals division (board of review). On April 7, 1999, the board of review reversed the decision of the unemployment compensation referee, and held that Aldamar was justified in discharging the plaintiff. The board of review concluded that "the claimant was discharged for wilful misconduct."

Counts one, two, four, six, and eight of the complaint are directed against Aldamar. Counts three, five, and seven are directed against Marks.[1] On May 30, 2003, the defendants filed a motion for summary judgment on all counts of the complaint.

"Practice Book §17-49 provides that summary judgment shall be rendered forthwith if the pleadings, affidavits and any other proof submitted show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. In deciding a motion for summary judgment, the trial court must view the evidence in the light most favorable to the nonmoving party . . . The party moving for summary judgment has the burden of showing the absence of any genuine issue of material fact and that the party is, therefore, entitled to judgment as a matter of law." (Internal quotation marks omitted.) *Webster Bank v. Oakley*, 265 Conn. 539, 545, 830 A.2d 139 (2003). "If the affidavits and the other supporting documents [submitted by the nonmovant] are inadequate, then the court is justified in granting the summary judgment, assuming that the movant has met his burden of proof." (Internal quotation marks omitted.) *2830 Whitney Avenue Corp. v. Heritage Development Canal Associates, Inc.*, 33 Conn.App. 563, 569, 636 A.2d 1377 (1994). When a party moves for summary judgment "and there [are] no contradictory affidavits, the court properly [decides] the motion by looking only to the sufficiency of the [movant's] affidavits and other proof." *Heyman Associates No. 1 v. Ins. Co. of Pennsylvania*, 231 Conn. 756, 795, 653 A.2d 122 (1995).

I

In counts one and two of her complaint, the plaintiff alleges that Aldamar wrongfully discharged her for filing a workers' compensation claim, in violation of General Statutes §31-290a[2] and in breach of an implied covenant of good faith. The defendants move for summary judgment on the ground that these claims are barred by the doctrine of collateral estoppel because the board of review has determined that the plaintiff was discharged for wilful misconduct. The plaintiff responds that pursuant to General Statutes §31-290a, she was only authorized to file a claim that Aldamar violated §31-290a with either the Superior Court or with the workers' compensation commission. Therefore, the plaintiff claims that the unemployment division had neither the jurisdiction or the authority to rule upon a §31-290a claim, and that its ruling does not bar her from litigating her §31-290a claim in this action. The issue before the court is one of first

impression in Connecticut: Whether the doctrine of collateral estoppel applies to preclude a party who has been denied unemployment compensation benefits from litigating a claim of wrongful discharge under §31-290a or a claim of breach of the covenant of good faith.

"The common-law doctrine of collateral estoppel, or issue preclusion, embodies a judicial policy in favor of judicial economy, the stability of former judgments and finality . . . Collateral estoppel means simply that when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit . . . Issue preclusion arises when an issue is actually litigated and determined by a valid and final judgment, and that determination is essential to the judgment . . . Collateral estoppel express[es] no more than the fundamental principle that once a matter has been fully and fairly litigated, and finally decided, it comes to rest.

"Application of the doctrine of collateral estoppel is neither statutorily nor constitutionally mandated. The doctrine, rather, is a judicially created rule of reason that is enforced on public policy grounds . . . Accordingly . . . the decision whether to apply the doctrine of collateral estoppel in any particular case should be made based upon a consideration of the doctrine's underlying policies, namely, the interests of the defendant and of the courts in bringing litigation to a close . . . and the competing interest of the plaintiff in the vindication of a just claim[3] . . . The judicial doctrines of res judicata and collateral estoppel are based on the public policy that a party should not be able to relitigate a matter which it already has had an opportunity to litigate.

"We also have recognized, however, that the application of the collateral estoppel doctrine has dramatic consequences for the party against whom the doctrine is applied. [Consequently] [c]ourts should be careful that the effect of the doctrine does not work an injustice . . . Thus, [t]he doctrines of preclusion . . . should be flexible and must give way when their mechanical application would frustrate other social policies based on values equally or more important than the convenience afforded by finality in legal controversies." (Citations omitted; internal quotation marks omitted.) *Cumberland Farms, Inc. v. Groton*, 262 Conn. 45, 58-60, 808 A.2d 1107 (2002).

"In establishing exceptions to the general application of the preclusion doctrines, we have identified several factors to consider, including: (1) whether another public policy interest outweighs the interest of finality served by the preclusion doctrines . . . (2) whether the incentive to litigate a claim or issue differs as between the two forums . . . (3) whether the opportunity to litigate the claim or issue differs as between the two forums; . . . and (4) whether the legislature has



evinced an intent that the doctrine should not apply."
*Id.,* 61.

Here, the last factor is dispositive. Connecticut General Statutes §31-249g(b) provides: "No finding of fact or conclusion of law contained in a decision of an employment security appeals referee, the board of review or a court, obtained under this chapter, shall have preclusive effect in any other action or proceeding except proceedings under this chapter." This provision is in chapter 567, which is entitled "Unemployment Compensation." General Statutes §31-290a is in chapter 568. An action for breach of the implied covenant of good faith is an action at common law. Since neither action is a proceeding under chapter 567, a determination by the board of review does not have any preclusive effect as to them.

General Statutes §31-249g(b) is clear and unambiguous. Therefore, the court has no need to consider other policy factors that may militate for or against the application of the doctrine of collateral estoppel. "Primarily, it is for the legislature, which is the arbiter of public policy, to determine what it shall be." *General Motors Corporation v. Mulquin,* 134 Conn. 118, 132, 55 A.2d 732 (1947). "A statute declares public policy." *Laurel Bank & Trust Co. v. Mark Ford, Inc.,* 182 Conn. 437, 442, 438 A.2d 705 (1980).

Because of General Statutes §31-249g(b), the doctrine of collateral estoppel does not operate to preclude the plaintiff's claims that the defendants violated General Statutes §31-290a or breached the implied covenant of good faith. Therefore, the defendants' motion for summary judgment is denied as to counts one and two.

## II

In counts three and four, the plaintiff alleges that Marks and Aldamar libeled her. She claims that certain statements the defendants made in two particular documents were "false and malicious," and as a result of those libelous statements, she has suffered damages.

The first document is a termination letter dated October 13, 1998, that Marks sent to the plaintiff. Included in the letter is the following statement: "As a result of your dishonest acts including lying, attempted extortion and blackmail, you are hereby terminated."[4] The defendants argue that the termination letter was not published and, therefore cannot support a claim for libel. "To prevail on a common-law defamation claim, a plaintiff must prove that the defendant published false statements about her that caused pecuniary harm." *Daley v. Aetna Life and Casualty Co.,* 249 Conn. 766, 795, 734 A.2d 112 (1999). "The term 'publication' generally refers to the communication of words to a third person." *Springdale Donuts, Inc. v. Aetna Casualty and Surety Co. of Illinois,* 247 Conn. 801, 810, 724 A.2d 1117 (1999). "The self-defamation doctrine is a narrow exception to the above

rule requiring publication to a third party . . . This cause of action for 'self-defamation' requires that a defamatory statement be communicated to one other than the plaintiff, and that the plaintiff communicated the statement under compulsion." (Citations omitted; internal quotation marks omitted.) *DeFilippo v. Balfour Beatty Construction, Inc.,* 47 Conn.Sup. 555, 558, 814 A.2d 919, 33 Conn. L. Rptr. 466 (2002).

In support of their motion, the defendants submit a portion of the plaintiff's deposition testimony, in which she testified that she did not show the October 13, 1999 letter to any other person. In addition, the defendants submit an affidavit by Marks in which he attests that the letter was mailed only to the plaintiff, and not published to a third person. Accordingly, the defendants have established that no issue of fact exists and that the letter of termination was never published. Therefore, the plaintiff's claim of libel based on the letter fails. See *Orell v. UMass. Memorial Medical Center, Inc.,* 203 F.Sup.2d 52 (D.Mass. 2002).

The second document, also dated October 13, 1998, is an unemployment notice, or "pink slip," completed by Marks in which he stated that the plaintiff was discharged from her employment for "wilful misconduct." The defendants contend that the pink slip was not "published" as that term is used in connection with the tort of defamation and that Marks was absolutely privileged to make the statements contained therein. The defendants again refer to the plaintiff's deposition testimony, in which she testified that she did not show the notice to any other person. In addition, in his affidavit Marks states that he mailed the pink slip only to the plaintiff and to the Connecticut department of labor, employment security division.

"[A]n employer who discharges an employee has an absolute privilege when supplying the information necessary for the 'unemployment notice' required by regulation." *Petyan v. Ellis,* 200 Conn. 243, 247, 510 A.2d 1337 (1986). "The effect of an absolute privilege is that damages cannot be recovered for a defamatory statement even if it is published falsely and maliciously." *Id.* 246.

Therefore, as a matter of law, the defendants' letter to the plaintiff was never published and their employment notice was privileged. For these reasons the plaintiff's libel action may be based on neither document. The defendants have met their burden that no genuine issue of material fact exists as to counts three and four and that they are entitled to judgment as a matter of law on those counts. Summary judgment is granted as to counts three and four.

## III

In counts five and seven the plaintiff alleges claims for intentional and negligent infliction of emotional distress against Marks based on the allegedly defamatory statements contained in the October 13, 1998 letter and the unemployment notice. In counts six and



44

*The Connecticut Law Reporter*
Cite as 36 Conn. L. Rptr. No. 2, 44 (January 12, 2004)

eight, the plaintiff alleges that Aldamar is also liable to her for intentional and negligent infliction of emotional distress based on the same defamatory statements, pursuant to an agency relationship between Marks and Aldamar. The defendants contend that if the plaintiff's libel claims fail as a matter of law, her claims for intentional and negligent infliction of emotional distress must also fail. The court agrees with the defendants.

"[W]here the plaintiff has failed to sustain [her] cause of action for defamation the plaintiff's cause of action for intentional or negligent infliction of emotional distress, which is dependent upon and interrelated to the plaintiff's defamation action, must also fail." *Lapadula v. Von Mahland*, Superior Court, judicial district of Middlesex at Middletown, Docket No. CV 90 0065689 (August 18, 1993) (10 Conn. L. Rptr. 10). Moreover, as to the unemployment notice, "[i]f the defense of absolute privilege precludes liability for defamation, it also applies to related causes of action such as . . . intentional or negligent infliction of emotional distress." (Citations omitted.) *Braunstein v. Hayes & Thynne, P.C.*, Superior Court, judicial district of Stamford/Norwalk at Stamford, Docket No. CV 91 0117928 (February 9, 1994) (9 C.S.C.R. 236). As the Supreme Court has stated, "[s]ince the defendant[s] had an absolute privilege to state [their] reasons for the termination of the plaintiff's employment in the 'fact-finding supplement' solicited by the employment security division, [they were] exercising a legal right in a permissible fashion and cannot be held liable for the intentional infliction of emotional distress." *Petyan v. Ellis, supra,* 200 Conn. 255.

The defendants' letter to the plaintiff arguably stands on different footing with respect to the claim of privilege than does the unemployment notice. First, while both documents are dated October 13, 1998, only the notice was filed with the unemployment security division. Second, while the unemployment notice simply indicates that the plaintiff was "discharged for wilful misconduct," the letter is more explicit, accusing the plaintiff of "dishonest acts, including lying, attempted extortion and blackmail . . ."

The court need not determine whether a privilege attached to this letter which, as observed *supra*, was never published. But cf. *Irwin v. Cohen,* 40 Conn. Sup. 259, 490 A.2d 552 (1985) (letter from one lawyer to another defamatory of one of the litigants preliminary to judicial proceeding, held, absolutely privileged).

A cause of action for negligent infliction of emotional distress requires the plaintiff to plead and prove "that the defendant should have realized that its conduct involved an unreasonable risk of causing emotional distress and that distress, if it were caused, might result in illness or bodily harm . . ." *Parsons v. United Technologies Corp.*, 243 Conn. 66, 88, 700 A.2d 655 (1997). "An individual making an emotional distress claim must show that a reasonable person would have

suffered emotional distress . . . that might result in illness or bodily harm . . . as a result of the defendant's conduct." (Citation omitted; internal quotation marks omitted.) *Perodeau v. Hartford,* 259 Conn. 729, 755, 792 A.2d 752 (2002). "[N]egligent infliction of emotional distress in the employment context arises only where it is based upon unreasonable conduct of the defendant in the termination process . . . The mere termination of employment, even where it's wrongful, is therefore not, by itself, enough to sustain a claim for negligent infliction of emotional distress. The mere act of firing an employee, even if wrongfully motivated, does not transgress the bounds of socially tolerable behavior." (Citations omitted; internal quotation marks omitted.) *Parsons v. United Technologies Corp., supra,* 243 Conn. 88-89. Indeed, the *Parsons* court observed that "it is not patently unreasonable for an employer to remove a discharged employee from its premises under a security escort." *Id.,* 89.

The letter from the defendants to the plaintiff in literal terms did go marginally beyond terminating her in that it explained the reasons the defendants were doing so. However, the holding in *Parsons* would be seriously undermined if an employer could be held liable for unlimited tort damages under the guise of having negligently inflicted emotional distress simply by writing the employee, and only the employee, why he or she was being discharged.[5] If the act of firing is not enough to sustain a claim for negligent infliction of emotional distress; *id.,* 88-89; neither is advising the employee in an unpublished writing such as that here; see note 4; why she is being discharged. See *Dicomes v. State,* 113 Wn.2d 612, 630, 782 P.2d 1002 (1989); *Etienne v. Wal-Mart Stores, Inc.,* 186 F.Sup.2d 129 (D.Conn. 2001).

For the same reasons, the defendants are entitled to summary judgment on the plaintiff's claim of intentional infliction of emotional distress. "In order for the plaintiff to prevail in a case for liability under . . . [intentional infliction of emotional distress], four elements must be established. It must be shown: (1) that the actor intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of his conduct; (2) that the conduct was extreme and outrageous; (3) that the defendant's conduct was the cause of the plaintiff's distress; and (4) that the emotional distress sustained by the plaintiff was severe." (Footnote omitted; internal quotation marks omitted.) *Carrol v. Allstate Ins. Co.,* 262 Conn. 433, 442-43, 815 A.2d 119 (2003).

"Whether a defendant's conduct is sufficient to satisfy the requirement that it be extreme and outrageous is initially a question for the court to determine . . . Only where reasonable minds disagree does it become an issue for the jury . . ." Liability for intentional infliction of emotional distress requires conduct that exceeds all bounds usually tolerated by decent society . . . Liability has been found only where the



conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." (Citations omitted; internal quotation marks omitted.) *Appleton v. Board of Education*, 254 Conn. 205, 210-11, 757 A.2d 1059 (2000).

As observed *supra*, in *Parsons v. United Technologies Corp.*, *supra*, 243 Conn. 88-89, the Supreme Court held that "[t]he mere act of firing an employee, even if wrongfully motivated, does not transgress the bounds of socially tolerable behavior." For the reasons discussed *supra*, this court holds that advising the employee in an unpublished writing, such as that here, why she is being discharged does not, without more, rise to the level of extreme and outrageous conduct.

## IV

To recap, the defendants' motion for summary judgment is denied as to counts one and two and is granted as to counts three through eight.

[1] On June 7, 1999 the defendants filed an answer and special defenses in which they allege, *inter alia*, the special defense that all counts of the complaint are barred by the doctrines of "res judicata and/or collateral estoppel."

[2] General Statutes §31-290a provides in pertinent part: "No employer . . . shall discharge, or cause to be discharged, or in any manner discriminate against any employee because the employee has filed a claim for workers' compensation benefits or otherwise exercised the rights afforded to him pursuant to the provisions of this chapter."

[3] These [underlying] purposes are generally identified as being (1) to promote judicial economy by minimizing repetitive litigation; (2) to prevent inconsistent judgments which undermine the integrity of the judicial system; and (3) to provide repose by preventing a person from being harassed by vexatious litigation." (Internal quotation marks omitted.) *Cumberland Farms, Inc. v. Groton*, 262 Conn. 45, 59, 808 A.2d 1107 (2002).

[4] The text of the defendants' letter states as follows:

Dear Ms. Evans:

It has come to my attention that a mistake has been made in the amount of your year to date remuneration. I am therefore amending your 1998 form W-2 by adjusting your reported earnings in the additional amount of $1650.00. You are responsible for paying the employee's share of FICA and the appropriate withholding taxes when you file your 1998 tax return.

In addition, despite your assurance of October 7, 1998 that you were physically able to return to work, you intentionally prolonged your absence in an effort to coerce me into providing you with greater compensation. Pursuant to your conversation with Matia Marks on October 7, 1998, you stated it was your intent to 'make me feel your absence' while you prolonged your claim of injury through dishonest and manipulative means. You specifically stated to her that you were physically capable of returning to work on October 6, 1998, but would not return until you received an increase in salary and benefits. Upon Ms. Marks' assertion that you could be terminated for such demands, you revised your statement and advised her that you would discuss an increase in salary and benefits with me. During your telephone conversation later that evening with Alice Marks and myself (in which you insisted that both of us

be on the telephone at the same time) you demanded 'help' with your financial situation and stated you would only come back to work if you received added medical insurance, dental benefits and other forms of unspecified increased compensation. I responded to these demands by advising you of my intent to discuss these issues with you after your return.

Your intent to use your absence to obtain greater compensation and increased benefits is dishonest and constitutes unacceptable demands upon your relationship with your employer. As a result of your dishonest acts including lying, attempted extortion and blackmail, you are hereby terminated. Enclosed you will find your pink slip (form #UC-61) stating that you are being discharged for wilful misconduct. An efforts on your part to collect unemployment benefits will be vigorously contested.

David Marks

President

Aldamar Toys Inc.

[5] In fact, in the area of public employment, due process requires advising the employee of the reasons for discharge. *Cleveland Board of Education v. Loudermill*, 470 U.S. 532, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985).

---

## James Thompson et al. v. Fairfield Country Day School Corporation

Superior Court at Bridgeport
No. CV02 039 65 13
Memorandum Filed November 20, 2003

**Statute of Frauds – Agreement Respecting Real Estate – Interest in Land – Agreement to Refrain from Increasing the Enrollment of a Private School, Made to Induce Neighborhood Support for a Proposed Zoning Application, Is Subject to the Statute of Frauds and Therefore Unenforceable If Not in Writing.** Any land use restriction, including an agreement to refrain from using the promisor's real property in a certain manner, constitutes an "agreement for the sale . . . of any interest in or concerning real property" as that phrase is used in the Statute of Frauds, CGS §52-550(a)(4), and therefore is unenforceable if not in writing. This opinion holds that promises by a private school to nearby property owners not to expand the school through either an increase in enrollment or the construction of additional facilities, made to induce neighborhood support for a zoning application, is subject to the Statute of Frauds and therefore is unenforceable with respect to a substantial expansion proposed several years later. The agreement may, however, be enforced under a theory of promissory estoppel.

---

WOLVEN, J. On May 12, 2003, the defendant, Fairfield Country Day School Corporation, moved this court to strike Counts One, Two and Five of the plaintiffs' Amended Complaint, dated February 11, 2003, as well as the Prayers for Relief for Counts One and Two. It is the defendant's position that these counts fail to state legally cognizable claims; moreover, the Prayers for Relief fail to allege the necessary claim of irreparable harm. The plaintiffs filed a Second